**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**KATINA SNAPP**                                                    **PLAINTIFF**

**VERSUS**                                                    **NO.: 1:05CV77-M-D**

**RUAN TRANSPORT CORPORATION
and GLENN PENNINGTON**                                        **DEFENDANTS**

<u>**ORDER**</u>

This cause comes before the court on the motion of defendants Ruan Transport

Corporation ("Ruan") and Glenn Pennington for summary judgment, pursuant to Fed. R. Civ. P.

56.  Plaintiff Katina Snapp has responded in opposition to the motion, and the court, having

considered the memoranda and submissions of the parties, concludes that the motion should be

granted in part and denied in part.

This is, *inter alia*, a sexual harassment and retaliation action brought pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), arising out of plaintiff Snapp's former

employment at defendant Ruan's Columbus, Mississippi trucking facility.  On April 5, 2001,

Snapp submitted an application to Ruan, and she was hired based upon a recommendation from

defendant Pennington, who was once the step-father of the man whom Snapp had recently

divorced. Snapp's duties involved answering the telephone and other office duties, and

Pennington was her immediate supervisor.  Snapp's position at Ruan was initially part-time, but

she became a full-time salaried employee in 2002.   Plaintiff alleges that during her employment

at Ruan, she was subjected to severe sexual harassment at the hands of Pennington which began

in the months following her beginning employment there.

Snapp's alleged harassment at the hands of Pennington continued and gradually worsened

until June 30, 2004, when she finally reported a particularly egregious incident of harassment to the Columbus Police Department. Pennington was arrested and charged with stalking and voyeurism, and he plead guilty to the latter charge and was sentenced to one year of house arrest with four years probation. Soon after Pennington's arrest, Snapp reported Pennington's harassment to Ruan for the first time, and Pennington was promptly fired. Plaintiff alleges, however, that she was subsequently subjected to a persistent campaign of retaliation on the part of Ruan managers and employees for her having reported Pennington's harassment. Plaintiff alleges that this retaliation eventually forced her to quit her job at Ruan, and, on March 22, 2005, she filed the instant action against Ruan and Pennington. Ruan and Pennington have each filed motions for summary judgment, alleging that there exists no genuine issue of material fact regarding plaintiff's right to recover against either of them.

**Sexual harassment/Title VII**

In the 1998 companion cases of *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) the U.S. Supreme Court divided Title VII allegations of harassment by supervisors into two categories. Under the *Faragher/Ellerth* approach, when a supervisor exercising his authority to make critical employment decisions on behalf of his employer takes a sufficiently concrete action with respect to an employee (a so-called "tangible employment action"), the employer may be held vicariously liable, without any showing that it failed to exercise due care to prevent and/or correct the harassment. *Id.* at 760-65, 118 S.Ct. 2257. In the court's view, plaintiff has failed to establish fact issues as to whether she suffered a

"tangible employment action" resulting from Pennington's sexual harassment in this case. While Pennington's alleged harassment of plaintiff certainly appears to be extreme in nature, the court can not conclude that any tangible employment action resulted from it. Plaintiff is therefore limited to proceeding under a hostile work environment theory on her sexual harassment claims.

Under the *Faragher/Ellerth* approach, if a plaintiff has failed to prove a "tangible employment action," she may still recover for severe or pervasive sexual harassment that results in a hostile work environment. Unlike in "tangible employment action" cases, however, the employer has the opportunity to avoid liability for such claims by establishing the elements of the "reasonable care" affirmative defense. *Faragher*, 524 U.S. at 807-08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. To prevail on the affirmative defense of "reasonable care," an employer must prove (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [it] or to avoid harm otherwise." *Id.*

For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (*quoting Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). In determining whether an environment is "hostile" or "abusive" within the meaning of Title VII, courts look at the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Harris v. Forklift*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In her brief, plaintiff alleges a lengthy list of harassment which she claims to have suffered at the hands of Pennington, as follows:

Around February 2002, the first act of sexual harassment that Katina Snapp remembers committed by Pennington occurred when Ms. Snapp discovered her dirty panties insider Pennington's jacket pocket. A month earlier, Pennington was helping Ms. Snapp move, at which time, he took her dirty panties out of her dirty clothes hamper and put them in his pocket. Pennington admitted that he took two pair of panties out of Katina Snapp's house and kept them in his jacket pocket.

On another occasion, Pennington had purchased a pair of panties and put them in Katina Snapp's desk drawer and "asked me to go to the bathroom and put them on and wear them and return them to him." According to Snapp, Pennington would intentionally push himself up against Ms. Snapp near the copier, rubbing his pelvic area up against her butt. Pennington showed Ms. Snapp a bag of hair that he had collected from her chair and other places. Ms. Snapp told Pennington that it was gross and she asked him to throw it away. Pennington showed Katina Snapp a stack of pictures he had taken when he visited Ruan corporate in Des Moines, Iowa. In the middle of the stack was a picture he had taken of his penis while in the hotel room. Pennington testified in his deposition that it was an accident, "Sitting on my bathroom counter when I was in - - at a meeting. And I was doing my hair. And when I set the hairspray down, I - - the only thing I can figure is it hit the camera." Pennington further testified, under oath, that he got the pictures developed at Wal-Mart in Columbus, and without looking at them, showed them to Ms. Snapp.

Pennington asked Katina Snapp, if her husband died, would she be with him. Ms. Snapp found this question "scary." Pennington tried to grab Katina Snapp's breast. Ms. Snapp grabbed his hand and slapped him. Pennington admitted that as a common occurrence he would touch Katina Snapp's butt without asking her permission. According to Pennington, "What I thought is if she didn't want me to do it, she'd tell me not to do it." Pennington further testified, "The right I had was if she don't have a problem with it, if she don't look at me and tell me, Glenn, don't do it, then I did it." Pennington would come out of the bathroom unzipped, exposing himself. He also admitted that he didn't wear underwear. Pennington would ask Katina Snapp to come over to look at his computer, where he would be leaning back in his chair exposing himself with his penis outside his pants. Pennington did this around six times, the last time around April or May of 2004.

Pennington would stalk Ms. Snapp, watching her exercise at the BMH track in Columbus.  Ms. Snapp became afraid that Pennington might rape her because he became so obsessed and perverted.   Pennington would call Katina Snapp at home at night while watching pornography and masturbating.   Ms. Snapp knew it was him because she had caller identification.  Pennington did this on approximately four occasions.

After being arrested, the police recovered seven pictures of Katina Snapp in Pennington's bedroom at her house.   Some of the pictures were taken by Pennington without Ms. Snapp's knowledge.  Pennington admitted that he kept these pictures on a night stand beside his bed. ... Pennington would go on Katina Snapp's computer and visit pornographic sites.  Pennington would speak to Ms. Snapp in a sexual manner asking her: what her pubic hairs looked like; did she shave, or was it full grown, or was it peach fuzz.  Pennington commented that her boobs were getting bigger during her pregnancy, that she was losing weight and her butt was getting tighter.  Pennington would ask Katina Snapp whether her husband was having sex with her during her pregnancy, that it was the best time to have sex with a women. [sic.] Pennington made these offensive sexual comments up until the time he stopped working for Ruan. ...

As is usually the case, the sexual harassment escalated over time, and became more severe in 2004.  As Katina Snapp testified, "At the beginning of 2004, he became very scary and started doing a lot of horrific things that I had never encountered."  Katina Snapp did not report Pennington at this point, "Because I didn't know who to contact, and I was very afraid, at this point, for my life." ... "[b]ecause, to me, he was very obsessed and very perverted, and I was in fear for my safety."

On June 15, 2004, while in the bathroom at Ruan, Katina Snapp had the feeling she was being watched.  When she came out of the bathroom, she caught Pennington in the closet next to the bathroom, covering up an erection with his hands.  Pennington later told Ms. Snapp that "I finally got to see your coochy for the first time."  Ms. Snapp had the "lifted" ceiling tile through which he had been watching her in the bathroom put back in place.  The next day, Pennington yelled at Snapp, "who put the tile back."

A few days later, Katina Snapp taped a conversation with Pennington, in which he admitted:

> GP: And I hope, like I said, that you can forgive me for being such an ignorant ass, but no, Katina, it's not like you said, I've seen you come walking through the doors, stand there by the corner.  I've done that many, many, many times, but Katina, I promise you that I ain't been in that room and climbed up on them boxes over 2 or 3 times.
>
> KS:  But that time you had a hard on and you had your hands covering it.  You know, that gave you away, like the way you jumped back and the way that you were covering your crotch.

> GP: I know.  I know.  And that's the reason I felt like such a piece
> of shit.  And . . .

On June 30, 2004, Katina Snapp reported the bathroom incident to the Columbus Police Department and Pennington was arrested and charged with stalking and voyeurism.  When he was arrested, there was hair found in his wallet.

Pennington gave a voluntary statement to the police where he admitted:

1. He watched Katina while she was using the bathroom through a ceiling tile;

2. He was sexually excited when peeping at her in the bathroom;

3. He would collect hair from her chair, desk and brush;

4. He would collect stuff like TCBY containers that she left in his van;

5. He took a dirty pair of panties out of her clothes hamper and kept in his coat pocket; and

6. He bought her panties and asked her to wear them, but she would not put them on.

> On February 23, 2005, Pennington plead guilty to voyeurism and was sentenced to five years, with one year house arrest, and four years probation.
> When asked why he plead guilty, Pennington responded, "Because I was guilty."

(Plaintiff's summary judgment brief at 5-12).

In his defense, Pennington argues that he had a personal relationship with Snapp, and he notes that he provided substantial financial assistance to plaintiff during a time when she was nearly destitute.  Specifically, Pennington argues that:

> Plaintiff further acknowledges that her employment at Ruan was because of Glenn Pennington in that she did not have a job, was in financial trouble and thus Pennington offered her a part-time position. ... Pennington found Plaintiff in her mobile home sitting in the dark, because she had no electricity nor did she have a telephone or cell phone and was unemployed.  Pennington paid to have Plaintiff's electricity reconnected and paid the back bill.  Interestingly enough, Pennington informed Plaintiff that he did this because he was not going to leave her without any electricity.  Moreover, Pennington did this and did not ask for any favors or anything in return for this act of kindness to Plaintiff. ...  Pennington bought Plaintiff's lunch almost every day.  Pennington gave her $400.00 to get her car out of a cash for title loan and paid two or three payments on her ring.  He brought her cigarettes regularly and gave her cash money several times including $160.00 a couple of weeks before she had Pennington arrested.

Moreover, Pennington argues that plaintiff encouraged his interest in her in various ways, to wit:

> Pennington was at home one night and was in bed.  Plaintiff called and asked would Pennington come and spend the night.  Pennington went to his daughter's

room and told her that he was going to Plaintiff's to spend the night. Plaintiff and Pennington talked for several hours and then she asked Pennington if he was going to sleep in the bed. He told her no, that she was going to sleep in the bed and that he would sleep on the couch. The next morning he got up, told Plaintiff bye and went home. ... Plaintiff always picked at Pennington about watching her in the bathroom. He had not done so. The first time she accused him, it upset him so badly that he was in tears. She said it was no big deal and to quit worry [sic.] about it. Pennington was not watching her. She would make remarks from that day on and giggle about it. .... Additionally, it is important to note that with regard to Plaintiff's credibility, while she denied that Pennington would massage her at her request at the office ... a disinterested witness, R. C. Reich, a guard at Ceco Corporation, testified quite clearly that this was a daily occurrence, and that Plaintiff made no objection.

With regard to the incident which led to his arrest and guilty plea, Pennington offers the following version of events:

On one occasion probably around June 15, 2004, Plaintiff went into the bathroom and Pennington noticed that she stayed in the bathroom a long time and at that time he was standing on some files doing work and there was a ceiling tile that had been lifted and had been lifted for some time but he did not lift the same. However, on this occasion and on this occasion only, he did look over into the bathroom momentarily but all he could see was Plaintiff shaving her legs. Right after that, they were outside the terminal building smoking and he made the comment to her like, "did you have a good time shaving your legs." Plaintiff was not offended and made no protest and everything was fine until about two weeks later when during the afternoon while they were outside smoking Plaintiff informed him that she wanted to leave for a few minutes. Right after that several police cars arrived and Pennington was arrested.

While it is clear that plaintiff and Pennington offer sharply differing accounts of the events in this case, at the summary judgment stage, this court is required to make factual inferences in favor of Snapp, as the non-moving party. Moreover, Pennington is unable to escape the fact that he plead guilty to criminal charges of voyeurism arising out of the June, 2004 bathroom incident. Snapp is clearly able to establish a prima facie case of hostile environment harassment based upon the lengthy list of severe harassment discussed above. Ruan does not appear to dispute this point but does argue that it took reasonable steps to prevent and correct any

acts of sexual harassment and that Snapp failed to take advantage of the reporting procedures

which it offered.  Specifically, Ruan argues that

> On April 12, 2001,  Snapp signed an acknowledgment stating that she had attended Ruan's mandatory sexual harassment training, which included the viewing of a sexual harassment videotape.   The signed document reads in part "I fully appreciate my duty as an employee of Ruan not to engage in sexual harassment as well as my duty to report sexual harassment practiced by others in the workplace."  A second acknowledgment of sexual harassment training is dated March 29, 2003 [and] also bears her signature.  Among other things, the acknowledgment included the following statement:
>> If I feel I am being harassed, I have the right and responsibility to communicate this directly to my manager or the Ruan Human Resources Department at 1-800-845-6675."
> Ruan has a detailed written anti-harassment policy. ... A laminated poster of Ruan's sexual harassment policy was posted in the office where Snapp worked. The poster included two different statements informing Ruan employees of the Human Resources Hotline number and informing them that they should call the number if there was any problem with any member of management including sexual harassment.  During her deposition, when asked to review a photograph of the office in which she worked, Snapp acknowledged that the sexual harassment poster was mounted on the wall directly in front of her desk, directly above her computer monitor screen.

Ruan also notes that once plaintiff finally reported Pennington's harassment, it acted promptly:

> George Neely is Ruan's Vice-President and Southeast Regional Manager.  After Pennington's arrest on July 1, 2004, Katina Snapp obtained Neely's telephone number and called him on July 2, 2004.  Plaintiff acknowledges this was the first time she had ever contacted anyone with the Company to report sexual harassment.  Snapp testified she cannot recall everything she told Neely but related the incident of Pennington watching her in the bathroom.  In her sworn deposition, Snapp testified that other than Pennington, no one else working for Ruan ever sexually harassed her.   Within 24 hours after Pennington had been released on bond, Neely talked to Pennington about the incident.  Based on that conversation and Pennington's admission of guilt as to the bathroom incident, Neely made the immediate decision to terminate Pennington's employment with the Company and Pennington never worked for Ruan again.

In light of the foregoing, the court concludes that Ruan took reasonable steps to prevent

and correct Pennington's sexual harassment. Snapp concedes that she failed to report any acts of sexual harassment in this case until after she had filed her police report in 2004. In the vast majority of cases, this would end the court's inquiry and Ruan would be entitled to the protection of the *Faragher/Ellerth* affirmative defense. However, implicit in the *Faragher/Ellerth* requirement that an employee have "unreasonably" failed to report acts of sexual harassment is the recognition that it may be reasonable, in certain circumstances, for an employee to fail to have reported acts of sexual harassment. Plaintiff argues that the extreme and persistent nature of the harassment by Pennington, as well as her testimony that she failed to report this harassment to Ruan supervisors out of fear for her safety, raise issues as to whether her failure to report Pennington's harassment was reasonable. Unfortunately for plaintiff, however, Fifth Circuit authority does not appear to support her argument in this regard.

The Fifth Circuit has rejected any argument that a plaintiff's subjective fear of retaliation might be a sufficient reason for failing to report acts of harassment to her employer. In *Harper v. City of Jackson Municipal School Dist.*, 149 Fed. Appx. 295, 301 (5th Cir. 2005), for example, the Fifth Circuit held that a plaintiff's "explanation that she was too intimidated to report the sexual harassment is insufficient to show that her failure to complain and cooperate were reasonable." In so concluding, the Fifth Circuit approvingly quoted from a prior district court opinion that:

> All harassment victims risk retaliation when they complain. For Title VII to be properly facilitated, the reasons for not complaining about harassment should be substantial and based upon *objective evidence* that some significant retaliation will take place.

*Harper,* 149 Fed.Appx. at 301 (*citing Young v. R.R. Morrison and Son, Inc.*, 159 F. Supp.2d 921

(N.D. Miss. 2000)) (emphasis added). In this case, as in *Harper*, plaintiff offers only her testimony regarding her subjective fear of retaliation at the hands of Pennington, if she were to report his harassment to Ruan. Specifically, Snapp testified in her deposition that "[a]t the beginning of 2004, [Pennington] became very scary and started doing a lot of horrific things that I had never encountered" and that she did not report Pennington at this point, "[b]ecause I didn't know who to contact, and I was very afraid, at this point, for my life. ... [b]ecause, to me, he was very obsessed and very perverted, and I was in fear for my safety."

If Snapp's version of events is deemed to be credible, then her fear of Pennington is arguably reasonable. As such, if Fifth Circuit authority permitted this court to excuse Snapp's failure to report Pennington's harassment based on her fear of physical retaliation from Pennington, then it would seriously consider doing so.[1] However, the Fifth Circuit continues to cite a five-part test for establishing a hostile work environment claim, the fifth element of which requires a showing that "her employer knew or should have known of the harassment and failed to take prompt remedial action." *Harvill v. Westward Communications*, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005). The Fifth Circuit in *Harvill* did recognize that there may be exceptions to the reporting requirement, but this exception appears to apply in cases where the employer itself previously disregarded reports of sexual harassment, i.e. when the employer itself did something wrong. Specifically, the Fifth Circuit in *Harvill* wrote that:

> We have also recognized that an employee must take advantage of corrective opportunities provided by the employer. ... Nonetheless, if an employee believes

---

[1]If plaintiff is able to find any Fifth Circuit authority holding that a subjective fear of retaliation might render a failure to report such harassment "reasonable" then she is encouraged to submit such authority prior to the trial in this action.

that bringing a subsequent sexual harassment complaint would be futile, or "it
becomes objectively obvious that the employer has no real intention of stopping
the harassment, the harassed employee is not obligated to go through the wasted
motion of reporting the harassment."

*Id.* (citing *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 300-01 (5th Cir. 2001)).   In light

of the foregoing, it seems clear that the Fifth Circuit has steadfastly refused to impose any sort of

strict liability upon employers in the sexual harassment context, regardless of how egregious the

underlying sexual harassment might have been.

While plaintiff's testimony of her fear of retaliation was arguably reasonable, Ruan's

argument that it should not be held liable for harassment of which it was not informed also

carries considerable weight.   There are competing public policy arguments on both sides of this

issue, and, for better or worse, the Fifth Circuit has found those offered by employers such as

Ruan to be more persuasive.   While Pennington's actions in this case as described by Snapp are

certainly disturbing, this was also the case of the allegedly harassing party in *Harper*, who was

alleged to have "repeatedly propositioned [plaintiff] for sex, uttered racy statements to her, ran

his hand up her thigh towards her private area, licked his tongue at her suggestively, felt her

behind, and even "snatched [her] breast out of [her] dress and stuck it in his mouth." *Harper,*

149 Fed. Appx. at 301.   This court is sympathetic to plaintiff's arguments that she was too

scared to report the incident in this case.   However, the court sees no basis upon which this case

might be distinguished from *Harper* and other Fifth Circuit authority which clearly bar

imposition of strict liability upon non-noticed employers in cases of sexual harassment by

employees.

In the court's view, plaintiff's only other offered reasons for failing to report

Pennington's harassment are rather weak.  Plaintiff argues that she did not know to whom she should report the harassment, but she conceded in her deposition that a poster containing a 1-800 number for her to report such incidents was located near her desk.   Plaintiff also testified that she was told by Pennington that Ruan's regional manager Neely was also sexually attracted to her and that she therefore felt it would be futile to report the incident on this basis.  In the court's view, however, such slight and subjective evidence is unavailing to plaintiff, particularly considering that the manager in question was not the contact person listed by Ruan for reporting acts of sexual harassment.  Moreover, plaintiff's testimony in this regard loses considerable force based on the fact that she did, in fact, eventually report the harassment to Neely, and he promptly fired Pennington as a result.

The court would also note that plaintiff's argument that she grew scared for her safety in 2004 does not excuse her failure to report the earlier and more benign acts of alleged harassment by Pennington.  If plaintiff had, in fact, reported this earlier harassment by Pennington, then she would be in a far better position to hold Ruan liable for the subsequent acts of harassment, assuming that such acts would have occurred at all.  Disregarding plaintiff's subjective fears and rumors, the only objective evidence before the court reveals that Ruan provided sexual harassment training to its employees, that plaintiff was informed that she should immediately report incidents of sexual harassment and given a 1-800 number to do so, and that, as soon as plaintiff got up the courage to report Pennington's conduct to Ruan, Ruan immediately terminated Pennington's employment.  While the harassment suffered by plaintiff appears to have been quite severe, Fifth Circuit authority clearly dictates that Ruan is entitled to the benefit of the *Faragher-Ellerth* affirmative defense in this case.  Defendant's motion for summary

judgment as to plaintiff's sexual harassment claims will therefore be granted.

**Title VII Retaliation**

The court now turns to plaintiff's claim that she suffered unlawful retaliation in reprisal for having made the complaint of discrimination in this case. Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), and its anti-retaliation provision forbids "discriminat [ion] against" an employee or job applicant who, *inter alia*, has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation, § 2000e-3(a). To survive summary judgment on a Title VII retaliation claim, a plaintiff must make a *prima facie* case: (1) that she was engaged in a protected activity, (2) that she experienced an adverse employment action following the protected activity, and (3) that a causal link existed between the protected activity and the adverse employment action. *Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 628-29 (5th Cir. 2000). If a plaintiff establishes a *prima facie case*, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317, 330 (5th Cir. 2004).

It is at this point in the familiar *McDonnell/Douglas* analysis that the current state of the law becomes somewhat unclear. It appears likely, but is not certain, that retaliation plaintiffs in this circuit may proceed under a mixed-motive framework which makes their burden of rebutting the defendant's legitimate, non-retaliatory reason considerably easier. The Fifth Circuit first applied a mixed motive framework in ADEA cases in the 2004 decision of *Rachid v. Jack in the*

*Box, Inc.*, 376 F.3d 305 (5th Cir.2004), based upon the court's interpretation of the U.S. Supreme

Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84

(2003). The Fifth Circuit in *Rachid* concluded that an application of this mixed motive

framework required a very significant modification of the familiar *McDonell/Douglas* standard,

at least in ADEA cases, which modification was subsequently described by the Fifth Circuit as

follows:

> Within the (*Rachid*) mixed-motive framework, (1) the employee must make a
> prima facie case of discrimination; (2) the employer must articulate a legitimate,
> non-discriminatory reason for the adverse employment action; and *(3) the*
> *employee must offer sufficient evidence to create a genuine issue of fact either*
> *that (a) the employer's proffered reason is a pretext for discrimination, or-and*
> *herein lies the modifying distinction-(b) that the employer's reason, although true,*
> *is but one of the reasons for its conduct, another of which was discrimination.* If
> the employee proves that discrimination was a motivating factor in the
> employment decision, the burden again shifts to the employer, this time to prove
> that it would have taken the same action despite the discriminatory animus. The
> employer's final burden "is effectively that of proving an affirmative defense."

*Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (Tex. 2005) (emphasis added). It is

apparent that the *Rachid* holding makes it considerably easier for a plaintiff to survive summary

judgment, inasmuch as she need not prove that a defendant's stated reason for a given

employment action was false, but, rather, need only prove that "the employer's reason, although

true, is but one of the reasons for its conduct, another of which was discrimination." *Id.*

The *Rachid* court did not address whether the mixed-motive framework applied in

retaliation cases such as the present one, but, in a 2004 decision, this court ventured a guess that

plaintiffs in this circuit could, in fact, proceed under a mixed-motive framework in retaliation

cases. *See Warren v. Terex Corp.*, 328 F. Supp.2d 641, 646 (N.D. Miss. 2004). Other district

courts in this circuit subsequently agreed with this court's conclusion in this regard. *See, e.g.*

*Bergen v. Continental Cas. Co.*, 3:04-CV-0428-H, 2005 WL 292426, at 4 (N.D.Tex. Feb. 7, 2005); *Cones v. Duke Energy Corp.*, 367 F.Supp.2d 1092, 1100 (S.D. Tex. 2005); *Block v. Kelly Services, Inc.*, H-04-CV-2326, 2005 WL 2647970 (S.D.Tex. October 14, 2005); *Thomas v. Willie G's Post Oak, Inc.*, 2006 WL 1117959 (S.D. Tex. 2006). More importantly, the Fifth Circuit in *Richardson* itself adopted the *Rachid* mixed-motive framework in *FMLA* retaliation cases, concluding that "*Rachid* is the law of this circuit, and, even though it addresses a different anti-discrimination statute, consistency requires that we endorse the mixed-motive framework in appropriate FMLA retaliation cases." *Richardson*, 434 F.3d at 334.

While *Richardson* appeared to settle the matter, a different Fifth Circuit panel recently wrote that "(t)his circuit has not extended the holdings of *Desert Palace* or *Rachid*, both of which concern discrimination claims, to Title VII retaliation claims." *Staten v. New Palace Casino, LLC.*, 2006 WL 1737438 (5th Cir. 2006). While this is, strictly speaking, true, the Fifth Circuit in *Richardson* clearly applied the *Rachid* holding to FMLA retaliation claims, and it seems inconceivable to this court that the Fifth Circuit would apply differing standards to FMLA and Title VII retaliation claims. This court will therefore reiterate its view expressed in *Warren* that the Fifth Circuit will, in fact, apply the *Rachid* holding in Title VII retaliation claims in appropriate cases. The court therefore concludes that the mixed-motive option is available to plaintiff in this case.

The court would also note that plaintiff's task of surviving summary judgment as to her retaliation claims was made considerably easier by a recent United States Supreme Court decision which clarified the sort of adverse actions which might support a retaliation claim. In *Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, --- L.Ed.2d

---- (2006), the Supreme Court held that the scope of adverse employment actions covered under Title VII retaliation claims extends beyond "ultimate employment decisions," such as "hiring, granting leave, discharging, promoting, and compensating," and includes actions which are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S.Ct. at 2409, 2410, 2414. The Supreme Court further clarified that the retaliation plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

Pursuant to *Burlington Northern*, the issue of whether a particular employment action was "materially adverse" is fact-intensive and "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington Northern*, at 2416-17. The potentially broad scope of the Supreme Court's holding in *Burlington* is highlighted by the following passage in the opinion:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." ... A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. .... A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. ... Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that

would be immaterial in some situations is material in others."

*Id.* at 2415-16 (citations omitted).

While courts have had little time to absorb the implications of the *Burlington Northern* decision, it clearly appears to represent a fairly dramatic expansion of the retaliation cause of action in the Fifth Circuit, which has previously required that a plaintiff prove she suffered an adverse "ultimate employment action" in order to recover in retaliation cases. *See, e.g. Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705-07 (5th Cir.1997), *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir.1995)(requiring a showing of an ultimate employment decision, such as "hiring, granting leave, discharging, promoting, and compensating" in retaliation cases). Having clarified (to the extent possible) the legal framework of this claim, the court must now consider the evidence of retaliation presented by plaintiff in this case. In her brief, plaintiff alleges that the following acts of retaliation took place:

> On August 2, 2004, Plaintiff filed her EEOC charge alleging sex discrimination against Ruan. On August 16, 2004, because of the trauma and anxiety that Katina Snapp was suffering from Glenn Pennington, prior to his discharge, and Buchanan and other Ruan and Ceco employees after Pennington's discharge, she had to take a medical leave of absence. On September 13, 2004, Katina Snapp returned to work at Ruan.
> However, when William Herrick became the new terminal manager for Ruan the harassment resumed. Herrick would talk to Pennington on the telephone in Ms. Snapp's presence at work. Herrick would also would let Pennington back on property to pick up loads for Rickman trucking. Herrick changed Ms. Snapp's work hours and took away her keys to the office. The redesigned office done to make Katina Snapp more comfortable was also changed back by Herrick. Herrick told Ms. Snapp she could no longer use her cellular telephone. Herrick demoted Ms. Snapp from being a salaried dispatcher, back to being an hourly "terminal assistant," the job she had been promoted from to dispatcher a couple years previously. This demotion affected Katina Snapp's

pay grade, potential pay raises and benefits. Herrick would not allow Ms. Snapp to come in early or work with her in any way as far as flexible hours. In fact, in January 2005, Herrick was reprimanded by HR because he would not allow Katina off to take her sick child to the doctor. It was clear that Ruan was trying to make things as difficult as possible for Katina Snapp and trying to get rid of her ...

Instead of working with her during the time she was trying to heal from the severe sexual harassment she had been subjected to, Ruan would constantly write her up for missing work in an attempt to justify firing her. Over a seven month period, she was written up at least four times. As Katina explained in her victim impact statement, missing work was unavoidable, "I've lost time from work for medical treatment and counseling." Further, William Herrick was telling Katina Snapp that she needed to get another job. "Why don't [you] get a new job. Why don't [you] leave." Herrick told Ms. Snapp, "any mother of a young child should not be working." Herrick would talk to his buddy, Glenn Pennington, in front of Ms. Snapp, "And he was just laughing and - - and talking to him. And they were talking about different trucks in the area." They did this on two or three occasions. Glenn Pennington's daughter would visit Herrick at Ruan and Herrick would have Katina go sit in her car while he visited with her. Even with all the perverted things that Pennington did, Herrick still had naked pictures and jokes in the office. There is no indication that Ruan did anything to clean up the locker room atmosphere at Ruan in Columbus after firing Pennington. Security guard R.C. Reich testified that he noticed people giving Katina Snapp a hard time after Pennington was fired and thought "they were very insensitive on occasions." Besides Ruan Managers Buchanan and Herrick, other employees of Ruan acted angry towards Katina Snapp because she had reported him sexually harassing her. Brad Petty callously laughed at Ms. Snapp concerning Pennington watching her in the bathroom.

Charles Howard told Katina Snapp that Pennington was ruined and his name was mud. Ms. Snapp responded that she was in fear for my life and being raped, to which Howard responded, "raping you is not killing you." Howard told Katina Snapp that Ceco and Ruan did not want her there, they did not trust her and they wanted her to leave. They called her the "little red devil." They would tell people not to talk to her or they would go to jail.

According to Bruce Hamner, one of the drivers at Ruan during all relevant periods:

Q. After Glenn Pennington was fired, isn't it true that a lot of people at

Ruan and Ceco there blamed Katina for getting Glenn fired?

A.  Yes, sir.

Q.  And to your knowledge, why did they think it was her fault?

A.  I don't know.

Q.  Did you observe people being mean to her or saying things to her?

A.  Well, it wasn't the best environment to work in, what little - - when I was in there.

Q.  Because of what reason?

A.  Well, it just was a lot of animosity there.

Q.  And animosity - -

A.  Toward her.

Q.   Animosity was towards her - -

A.  Right.

. . .

Q.  And do you know of any other reason why there was animosity towards her other than getting Glenn fired?

A.  No, not that I know of.

Q.  Did you notice any animosity towards her before getting Glen fired?

A.  No, sir.

Q.  Did you know whether or not from your observations Ruan did anything to stop this animosity against her because of Glenn being fired?

A.  No, sir.  I didn't see anything that anybody tried to stop anything.


Hamner further testified that:

Q.  Did you ever observe Mr. Herrick using inappropriate language in front of her?

A.  Yeah. . .  yes, sir.

Q.  Isn't it true that you told him not to use that language in front of her?

A. . . . I've suggested you don't you don't use that kind of language in front of ladies.

Q.  An what kind of language did you hear Mr. Herrick use?

A.  Well, just, you know, cuss words.

Q.  And he did this in front of Ms. Snapp, right?

A.  Uh-huh.

Finally, Hamner testified:

Q.   . . . from your observation, was Ruan trying to get rid of Katina Snapp?

A.   Well, I can't say about that, sir, but they sure didn't make it easy on her.

Q.   . . . did you think from what she had been through with Glenn Pennington they should have been a little more accommodating?

A.  Well, if it had been my wife, or your wife or your daughter or my

daughter, you would have wanted them to.

Defendant has submitted supplemental arguments in light of *Burlington*, arguing that plaintiff is still unable to establish genuine issues of material fact regarding her retaliation claim:

> In the instant case, Plaintiff's claims of retaliatory acts do not approach the level required by *Burlington*. In this case, all of the purported acts cited by Snapp were <u>after</u> Pennington was fired. She claimed that individuals <u>not</u> employed by Defendant Ruan called her names and made jokes about her getting people sent to jail and were very "standoffish." *Katina Snapp at 291-293, 181.* As noted above, such "teasing" or "snubbing" is not actionable, even if done by an employee of the Defendant, which did not occur in this case. Plaintiff also claims being written up for missing work was retaliation, but admits that for a seven month period, she <u>did</u> <u>not</u> work her full hours and took time off despite the fact she had no accrued leave whatsoever, and as such the write-ups were warranted. *See Exhibit "CC", Katina Snapp at 244-46, 248-49.* Likewise, she speculates that Ruan's nationwide compliance with the new Fair Labor Standards Act regulation, which led to Snapp and dozens of other employees being reclassified as hourly workers was retaliation, despite her admission that she would make the same amount of money if she worked 40 hours a week and other than the title change, her duties remained the same. *Katina Snapp at 203-05, 213.* None of these meet the level of "materially adverse" and would not dissuade a reasonable employee from making or supporting a charge of discrimination.

This court finds defendant's arguments to be unpersuasive. In the court's view, the evidence cited by plaintiff is more than sufficient to create fact issues regarding whether she suffered unlawful retaliation under the *Burlington Northern* standard. In the court's view, plaintiff's evidence of retaliation goes far beyond "teasing" and raises the question as to whether defendant, acting largely through the actions of the Terminal Manager Herrick, was trying to make plaintiff's employment at Ruan so uncomfortable as to force her to resign, which she eventually did. Moreover, the testimony of Bruce Hamner clearly raises fact issues as to whether this harassment was motivated by a retaliatory intent. Defendant's motion for summary judgment

will therefore be denied as to plaintiff's retaliation claims.

### Constructive discharge

The court now turns to plaintiff's constructive discharge claim. In order to establish liability under a constructive discharge claim, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2354 (2004); *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.,* 139 F.3d 532, 539 (5th Cir.1998). Mere harassment, alone, is insufficient; rather, the plaintiff must show "aggravating factors" to justify departure. *See Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). Such factors include (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir.2001).

Given that a trial will be required in this action on plaintiff's retaliation claim regardless, the court concludes that the better approach is to wait until after the presentation of the evidence at trial to determine whether plaintiff's constructive discharge claim should be presented to the jury. Clearly, the same sort of testimony will be required to establish each cause of action, but it is apparent that, particularly post-*Burlington*, plaintiff's constructive discharge claim requires a significantly higher showing of harassment by Ruan than is the case with her retaliation claim. The court can not conclude at this juncture that summary judgment would be in order as to

plaintiff's constructive discharge claims, but the court recognizes that this is a close call in light of the authority cited above. The court will therefore reserve final judgment until after the presentation of the evidence at trial as to whether the jury should be permitted to consider this claim.

### Plaintiff's claims against Pennington

The court now turns to the motion for summary judgment filed by Pennington. Plaintiff appears to concede that Pennington may not be held individually liable for sexual harassment under Title VII, but she asserts state law claims for intentional infliction of emotional distress (IIED) and tortious interference with business relations against this defendant.

The standard for establishing liability on an IIED claim is a stringent one. Liability for outrageous conduct should be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Morris v. Means*, 680 S.2d 803, 805-06 (Miss. 1996); *Brown v. Intercity Federal Bank for Savings*, 738 So.2d 262, 264 (Miss. 1999). In the court's view, if one is to accept Snapp's version of events as credible, then her description of Pennington's sustained and bizarre campaign of stalking, harassment and deviant behavior would be more than sufficient to create genuine issues of material fact as to whether she is entitled to recover against him for IIED. The court would hasten to add that Pennington has offered a very different version of the events in this case, but, to reiterate, the court is required at the summary judgment stage to view the facts in the light most favorable to Snapp, as the non-moving party. So considering the facts herein, the court concludes that this

case represents one of the comparatively rare cases in which an IIED claim might properly be brought under Mississippi law, and Pennington's motion for summary judgment will therefore be denied as to this claim.

In the court's view, it presents a closer issue as to whether plaintiff's intentional interference with contractual relations (IICR) cause of action should be dismissed. Mississippi law allows for recovery against those who intentionally and improperly interfere with the performance of a contract between another and a third party, causing the third party not to perform the contract and thereby causing injury. *Shaw v. Burchfield*, 481 So.2d 247, 254-55 (Miss.1985). Tortious interference even with at-will employment can be the basis of a claim. *Levens v. Campbell*, 733 So.2d 753 (Miss.1999). In seeking summary judgment, defendant cites *Cenac v. Murry,* 609 So.2d 1257 (Miss. 1992) for the proposition that in order to pursue a cause of action, it is accepted that the wrongdoer is a stranger to the contract, which was interfered with – an outsider. A party to a contract cannot be charged with interfering with his own contract.

*Cenac*, 609 So.2d at 1269. Defendant argues that as a Ruan manager, Pennington was not a third party to the contract so as to expose him to liability for intentional interference with contractual relations. While it seems clear that Ruan itself could not have interfered with its own contract, a review of Mississippi authority appears to indicate that managers for an employer may potentially face liability in this context if they exceed the scope of the good faith privilege which they have to interfere with a contract between their employer and an employee. In *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss.1985), for example, the Mississippi Supreme Court held that

> Where a corporation has a contract with another, and where an individual who is an agent of the corporation has responsibilities with respect to the contract, any actions taken in good faith within the scope of those responsibilities are privileged and thus not actionable. ... There being no showing of bad faith in the record sufficient to avoid summary judgment, and there otherwise being no genuine issue of material fact, we hold that the trial judge correctly determined the Defendants entitled to judgment as a matter of law.

*See also Morrison v. Mississippi Enterprise For Technology, Inc.*, 798 So.2d 567, 574 (Miss. App. 2001).

It seems clear that Pennington exceeded the scope of any managerial privilege which he might have enjoyed in this case, and the court has doubts whether this is a proper basis for the dismissal of plaintiff's claim. At the same time, the court has concerns regarding the implications of extending liability for IICR to the defendant's actions in this case. IICR has traditionally been a business tort, and the plaintiff has cited no Mississippi cases extending liability for this tort to anything approaching the facts in this case, which appears to reflect a personal romantic obsession on the part of Pennington rather than any intent to interfere with plaintiff's contract with Ruan. The court is reluctant to extend the IICR tort to the facts of this case, given that the Mississippi Supreme Court does not appear to have done so to date, and given also that plaintiff has available to her a claim for IIED which would appear to much better address Pennington's alleged conduct in this case. Indeed, if this court were to accept plaintiff's arguments on this issue, it would appear that plaintiffs might validly bring state law IICR claims in virtually any case of workplace sexual harassment in this state.[2] The court concludes that the

---

[2]The overly broad and vague nature of the IICR tort as envisioned by plaintiff is highlighted by her argument that:

> In the previous section, Katina Snapp noted thirty-one different acts committed by Pennington against Snapp. While these acts constitute sexual harassment and

Mississippi Supreme Court would refuse to endorse such an overbroad application of the IICR tort, and Pennington's motion for summary judgment will therefore be granted as to plaintiff's claims for intentional infliction of contractual relations.

In light of the foregoing, it is ordered that defendants' motions [69-1, 71-1] for summary judgment are granted in part and denied in part, as more specifically set forth in this order.

SO ORDERED this the 22nd day of August, 2006.

                        **_/s/ Michael P. Mills_**
                        **UNITED STATES DISTRICT JUDGE**

---

intentional infliction of emotional distress, they also constitute malicious interference with employment. Each act was intentional, intended to cause loss to Plaintiff, was done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant, and actual loss occurred.